NATIONAL LABOR RELATIONS BOARD, Petitioner/Cross–Respondent,

United Food and Commercial Workers International Union, AFL–CIO/CLC, Local 911, Intervenor,

v.

GOOD SHEPHERD HOME, INC., Respondent/Cross–Petitioner.

Nos. 97–5192, 97–5314.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1998.

Decided May 29, 1998.

Fred L. Cornnell, Jr. (briefed), Daniel J. Michalski (argued and briefed), N.L.R.B., Office of the General Counsel, Washington, DC, Aileen A. Armstrong (briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for Petitioner/Cross–Respondent.

Ted Iorio (briefed), Christine A. Reardon (argued and briefed), David E. Weisblatt, Kalniz, Iorio & Feldstein, Toledo, OH, for Intervenor.

George Roger King (argued and briefed), Gregory W. Guevara (briefed), Jones, Day, Reavis & Pogue, Columbus, OH, Paul P. DeCamp, Irell & Manella, Los Angeles, CA, for Respondent/Cross–Petitioner.

Before: KENNEDY, WELLFORD, and SILER, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

Good Shepherd Home, Inc. ("Good Shepherd") is a small non-profit nursing home located in rural Fostoria, Ohio. On September 15, 1995, the Union filed a petition with

the Board, seeking certification as the collective bargaining representative for a unit of the employees at Good Shepherd. On November 2, 1995, the Board conducted a secret ballot election, which resulted in 57 votes for the Union and 40 votes against the Union, with none challenged.

On November 9, 1995, Good Shepherd filed an objection to the election, alleging that the Union paid significant sums of money to employees to induce them to support the Union. After conducting an administrative investigation, the Regional Director issued a report on December 7, 1995, recommending that the objection be overruled. Good Shepherd filed exceptions to the report. On May 31, 1996, the Board (Chairman Gould and Member Browning; Member Cohen, concurring) rejected Good Shepherd's exceptions and certified the Union as the exclusive bargaining representative of the unit of employees.

Good Shepherd challenged the certification by refusing to give the Union certain information and by refusing to bargain. On July 11, 1996, the Union filed an unfair labor practice charge against Good Shepherd based on that conduct. After an investigation, the Board's general counsel issued a complaint alleging that Good Shepherd's actions violated §§ 8(a)(5) and (1) of the Act (29 U.S.C. §§ 158(a)(5) and (1)). Good Shepherd admitted that it refused to bargain, but it claimed that its refusal was not unlawful because the Union was not appropriately certified.

The general counsel filed a motion for summary judgment, and Good Shepherd filed a cross-motion for summary judgment. On September 30, 1996, the Board (Chairman Gould and Members Browning and Higgins) granted the general counsel's summary judgment motion. The Board found that "[a]ll representation issues raised by [Good Shepherd] were or could have been litigated in the prior representation proceeding," and that Good Shepherd did not offer to adduce "any newly discovered and previously unavailable evidence, nor [did] it allege any special cir-

cumstances" that would require the Board to modify the May 21, 1995 decision at the representation proceeding. In addition, the Board found that the information requested by the Union was "necessary and relevant." Accordingly, the Board issued appropriate remedies based upon Good Shepherd's refusal to bargain. Good Shepherd now appeals from that order.

Good Shepherd's argument that the certification was improper hinges on one allegedly inappropriate incident. On November 1, 1995, the day before the representation election, an organizing director for the Union handed part-time employee Brian Shaver $25 in cash in the presence of other employees. Shaver was a part-time employee and a full-time student at a college in Bluffton, which is about 31 miles from the Fostoria nursing home.[1] He had not been scheduled to work on the day of the election, and the $25 payment was purportedly to cover Shaver's travel expenses to and from work on November 2 so he cast his vote. Good Shepherd argued that the $25 was improper because that amount exceeded Shaver's actual travel expenses.

At the representation hearing, the Board found that the Union "has reimbursed the employee based on a good-faith, reasonable estimate of his actual travel costs." The Board considered the fact that Shaver travelled at least 31 miles each way in order to cast his vote, and that under the IRS reimbursement rate of $.30 a mile, his expenses would be $18.60. In light of that fact, the Board surmised that the $25 paid to Shaver was not "so excessive as to raise a question about the good faith of the Union." The Board, therefore, concluded that, "because the conduct at issue involves only the good-faith attempt to cover the actual travel expenses of an employee who would not have otherwise been able to vote, we find ... that no objectionable conduct occurred warranting a setting aside of the election." In reaching that conclusion, the Board relied in part on *Sunrise Rehabilitation Hospital,* 320 NLRB 212, 1995 WL 791954 (Dec. 19, 1995).

1. In an affidavit, Shaver stated that his college is about 50 miles from his workplace. Good Shepherd claims that the distance is about 31 miles.

In ruling on the certification, the Board based its decision on Good Shepherd's 31-mile determination.

Because Good Shepherd continued to refuse to bargain, the NLRB has petitioned this court to enforce its September 30 order, and Good Shepherd cross-petitioned for review. Good Shepherd maintains the position that the payment to Shaver was excessive and that it tainted the election. The Local Union filed an amicus brief supporting the Board's rationale.

■ The appropriate standard of review is set out in *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363 (6th Cir.1993):

> We sustain the Board's findings of fact only so long as they are supported by substantial evidence on the record viewed as a whole.... We also review the Board's application of the law to particular facts under the substantial evidence standard.... [Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... We review the Board's conclusions of law *de novo.* ... If the Board errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no reasonable basis in law.

*Pentre Elec.*, 998 F.2d at 368 (citations and quotations omitted). We examine the entire record to determine whether substantial evidence supports the Board's decision, and whether its conclusion is supported by law.

■ The parties agree that it is permissible to reimburse an employee for transportation expenses that relate to attending a Board election, because such payments are in furtherance of the electoral process. *See NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261, 264–65 (6th Cir.1975) (permissible for a Union to pay $20 to an employee where the payment appeared to be for expenses related to transportation to the preelection meetings); *Lawrence Sec., Inc.*, 210 NLRB 1048, 1048, 1974 WL 4977 (1974) (Union's offer to reimburse employees for parking at election was in furtherance of electoral process); *Federal Silk Mills*, 107 NLRB 876, 877 (1954) (Union's payment of $3.00 to employee carpool drivers was not objectionable

because payment made the process available to those who otherwise may have not been able to participate). Good Shepherd argues that the payment to Shaver in the instant case exceeded his transportation expenses and may have constituted an impermissible "reward" for voting in favor of the Union. In support of that position, Good Shepherd claims that the Board misapplied the Board's most recent case on this subject, *Sunrise Rehabilitation Hosp., supra.*[2]

In *Sunrise*, the Board found objectionable a handbill that was passed out by the employer which stated that any employee not scheduled to be at work on election day could come to work and vote, and that employee would receive two hours pay, transportation to and from the facility, and child care on the premises, if needed. At the bottom of the handbill, it stated, "WHEN YOU DO VOTE, WE HOPE THAT YOU WILL VOTE 'NO.'" The Board found that the distribution of the handbill before the election violated the Act because, among other things, the two hours of pay was not linked in any way to transportation expenses, the handbill was distributed to a large number of employees, and because employees might have reasonably perceived the 2–hour pay as a favor that should have been repaid by voting against the Union.

In reaching its conclusion, the Board in *Sunrise* overruled *Young Men's Christian Ass'n*, 286 NLRB 1052 (1987) (referred to as "*YMCA*"). In *YMCA*, the employers distributed an "Election Notice" to all employees, which stated that all employees not scheduled to work on election day would receive two hours pay "to cover [their] transportation and time costs." The notice also encouraged a "No" vote, stating that "[k]eeping Local 87 out will take the support of all eligible employees.... PROTECT YOUR FUTURE—VOTE—VOTE NO!!" The Board found that at least 15 employees took advantage of the offer, and that those employees were paid for two hours wages even though most were present only for a few minutes. The Board found that under the circum-

---

**2.** In addition, Good Shepherd claims that the Board's deference to the Union in this case and in other matters generally constitutes (1) a violation of its due process rights under the constitution, and (2) an arbitrary and capricious application of the National Labor Relations Act.

stances the employer's offer did not constitute unlawful interference with the Union election, reasoning that "the moneys paid did not constitute a substantial benefit which would influence votes, but rather were a reasonable reimbursement for transportation and time costs." *YMCA*, 1987 WL 90019, *2. The Board explained that "the wages compensated them for their cost of getting to the polling site rather than bestowing on them a windfall or bonus, and the employees had no reason to be at the facility except to vote." *Id.* One panel member dissented, expressing his concern that the two-hours wages were not "carefully restricted so as to serve only [the] limited purpose" of reimbursing expenses. The payments ranged from $10 to $37, which the dissenting member found to be "not insubstantial."

In *Sunrise,* the Board disagreed with the majority reasoning in *YMCA* and agreed with the sentiments expressed by the dissenting member. The handbill in *Sunrise* offered to provide child care and to pay two hours wages *in addition to* transportation expenses. Such a payment, then, was found not to constitute a reimbursement to facilitate the electoral process; rather, it was a payment that would have a reasonable tendency to induce employees to vote in favor of the employer.

In applying the above precedent to the facts of the instant case, the Board acknowledged that "monetary payments that are offered to employees as a reward for coming to a Board election and that exceed reimbursement for actual transportation expenses ... [constitute] objectionable conduct." The Board reasoned that the payment to Shaver was "solely linked to transportation expenses." Good Shepherd argued that the $25 may have exceeded Shaver's "actual" expenses, and that the Board should have held a hearing to make that determination. In response, the Board stated that the Union's payment to Shaver was "based on a good-faith, reasonable estimate of his actual travel costs." *Id.* The Board elaborated that it "would not require a party to produce receipts or other proof of an employee's 'actual' costs or to otherwise prove that the reimbursement was precise to a mathematical certitude. As long as the reimbursement

is clearly related only to actual travel expenses, and the party has made a good-faith effort to estimate those expenses, we would conclude that the party has not engaged in objectionable conduct." *Id.*

In a concurrence, Member Cohen suggested that the majority had departed from the "actual transportation expenses" of *Sunrise* in favor of a "good faith estimate" test. The test utilized by the majority, he believed, reflected the rule in *YMCA.* In any event, he thought that the $25 payment to Shaver under these circumstances was not objectionable.

█ It would appear that the Board's formulation and application of various tests in dealing with this problem has not been designed to promote certainty. We conclude, nevertheless, that the conclusion reached by the Board in this instance, but not necessarily its reasoning, is reasonable and appropriate and it is supported by substantial evidence, and we affirm the grant of judgment, despite prior inconsistencies in the Board's approach. It is widely accepted by the Board, particularly in *YMCA, Sunrise,* and in the Board order in the instant case, that off-duty employees may be reasonably reimbursed for transportation costs. We do not construe *Sunrise* to foreclose the conclusion that a "reasonable estimate" of those actual costs may be used, so long as the payment is not overly excessive or prone to influence the voter and others voters improperly. *See Basic Wire Products,* 516 F.2d at 264–65 (embracing the rule that it is not objectionable to reimburse employee for "reasonable" amount of expense incurred in attending pre-election conferences).

█ We reach the result stated indirectly in *Sunrise* that in this case the pay was "clearly related only to travel costs," and was not "reasonably perceived ... as a favor" to be repaid by voting a certain way in the election. The standard in *Sunrise,* which we approve, is whether the conduct involving an offer of money to pay for travel expense "has a reasonable tendency to influence the election outcome." 320 NLRB 212, slip op at 2. We also adopt the reasoning of the dissenting member of the Board in *Sunrise* that "the number of employees receiving the benefit is a relevant factor." 320 NLRB No. 28, 1995

818

WL 791954. In sum, taking into account the pertinent factors and circumstances, the Union's payment was objectively reasonable.

We are aware that the payment of $25 to Shaver as reimbursement for his transportation expenses may have exceeded the "actual" cost of his travel. However, we deem any excess to have been *de minimis.* We agree with member Charles L. Cohen that we "do not wish to see the Board delve into the minutiae of each case to ascertain precisely the reimbursement cost down to the last penny," particularly where only one employee is involved and his vote was in no way determinative of the election result. In addition, there was no proof that the payment was conditioned on an agreement to vote in favor of the Union.

Good Shepherd claims that it was entitled to a hearing to determine whether the payment exceeded Shaver's actual transportation expense. We disagree. Though the ALJ could have granted Good Shepherd a hearing, it was not reversible error not to have provided one under the circumstances.

Accordingly, we **GRANT** the Board's petition for enforcement and **DENY** Good Shepherd's cross-petition.